**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**CHARLES SANTANA,**

                    **Petitioner,**                    15-cv-1818 (JGK)

          **- against -**                    OPINION AND ORDER

**SUPERINTENDENT MICHAEL CAPRA, ET**
**AL.,**

                    **Respondents.**

---

**JOHN G. KOELTL, District Judge:**

The petitioner, Charles Santana, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On June 25, 2010, following a joint trial at which the petitioner's brother was also tried, the petitioner was found guilty by a Bronx County jury of one count of first-degree manslaughter but acquitted of second-degree murder. Thereafter, the petitioner was sentenced as a second-felony offender to twenty years' imprisonment with five years' post-release supervision.

In this petition, the petitioner argues that he was denied effective assistance of trial and appellate counsel in violation of his rights under the Sixth and Fourteenth Amendments. For the reasons explained below, the petition for a writ of habeas corpus is denied.

**I.**

**A.**

The record reflects the following relevant facts.

At approximately 2:15 a.m. on New Year's Day in 2008, Tiffany McClinton joined her cousin Kenneth McClinton at a party. Tr. 274-75.[1] Kenneth McClinton, who had been drinking alcohol and smoking marijuana, left the party about five minutes after Tiffany arrived. Tr. 275, 328-29.

Sometime after he left the party, Kenneth McClinton went to his mother's house, where he met Donisha Riggins. Tr. 374, 390. Just after they left the home, Kenneth McClinton pulled out a baseball bat that he had hidden in his pants. Tr. 391. Kenneth and Ms. Riggins then met up with Anthony McClinton, one of Kenneth McClinton's cousins. Tr. 330, 347. The three of them went to an apartment building where the petitioner and his brother, Alex Santana, lived with their mother, stepfather, and younger brother. Tr. 393. Mileni Fernandez, the Santanas' mother, told the three from her window that the brothers were not there, and the McClintons and Ms. Riggins left. Tr. 393. The

---

[1] Citations designated "Tr. ___" refer to the trial transcript, unless otherwise indicated. Citations designated "S.R. ___" refer to the state court record submitted with this petition. Citations designated "Video ## at _____" refer to the surveillance videos received in evidence at the petitioner's trial. The ## refers to the exhibit number the video was designated at trial. According to the petitioner, the time stamps on some of the videos are not accurate. Therefore, as used in this opinion, the time stamps are included only as points of reference and do not necessarily correspond to the time at which certain events took place.

trio soon ran into the Santana brothers, who were on their way back to their mother's apartment. Tr. 393-94. Kenneth McClinton asked the Santanas why they were always bothering him, and that confrontation precipitated a massive street brawl involving thirty to forty people. Tr. 379, 394-97.

During the fight that broke out, Kenneth McClinton swung the bat at petitioner, and Alex Santana fought with a number of other people nearby. Tr. 357-58. Ms. Fernandez and Virgilio Ruiz, the stepfather of Alex and the petitioner, as well as Ray Sanchez, entered the fray as well. Tr. 357-59. According to Tiffany McClinton, a group was trying to drag another McClinton cousin into a nearby building while Ms. Fernandez was hitting him. Tr. 283-85. Tiffany McClinton yelled for help, and Kenneth McClinton ran over and struck Ms. Fernandez in the head with his baseball bat. Tr. 285, 468. The Santana brothers came to their mother's aid and helped her back into their apartment building. Tr. 286.

As the melee ended, the Santana brothers, along with Ms. Fernandez, Virgilio Ruiz, and Ray Sanchez, reemerged from their apartment building. Tr. 286. Someone shouted that the Santanas had a gun, and people still on the street began to scatter. Tr. 287. Although none of them was in fact carrying a gun, Alex was armed with two knives, and the petitioner and Ray Sanchez were

each carrying a knife. Video 31 at 3:15.42; Video 40 at 2:43.40, 2:43.45.

Kenneth McClinton then ran away from the Santanas' group around the corner of Walton Avenue and 183rd Street. Tr. 290. The Santanas pursued Mr. McClinton and eventually caught up to him. Tr. 290.

Tiffany McClinton, who had been present on the outskirts of the melee, testified that she then ran around the corner at Walton Avenue as well. Tr. 290. Tiffany McClinton testified that, from across the street, she saw Ray Sanchez and the petitioner holding Kenneth McClinton up by his arms so that he seemed to have surrendered. Tr. 291-92. Tiffany McClinton testified that Alex, standing in front of Kenneth McClinton, then stabbed Kenneth in the chest. Tr. 292. The petitioner then allegedly stabbed Kenneth in the side. Tr. 292. Tiffany McClinton testified that she then turned away, and when she looked back, the Santanas and Ray Sanchez were running back to their apartment building. Tr. 293.

Donisha Riggins had run away from the fight fleeing southbound on Walton Avenue after someone yelled that the Santanas had a gun. Tr. 383. Donisha Riggins then walked back in the direction that Kenneth McClinton had run and came upon the scene of the stabbing. Tr. 384. Donisha Riggins testified that Alex Santana and the petitioner were leaning on two separate

4

parked cars while Kenneth McClinton lay on the ground trying to catch his breath. Tr. 385. Donisha Riggins then shouted, "[W]hy did you all do that? It wasn't even that serious," to which Alex replied, "Don't move . . . before I stab you." Tr. 385-86. Donisha Riggins testified that Alex Santana then stabbed Kenneth McClinton in the heart. Tr. 386. Donisha Riggins stayed with Kenneth McClinton and Tiffany McClinton until the police and an ambulance arrived. Tr. 387. Donisha Riggins did not testify that she saw the petitioner stab Kenneth McClinton.

Although a police surveillance video system was monitoring the area at the time, the stabbing itself was not within the field of view. Tr. 445. The surveillance system did capture the following events which preceded the stabbing. Tr. 445-46.

The Santana family -- including Charles, Alex, Mileni, and Virgilio -- entered their apartment building at 2270 Walton Avenue. Video 40 at 2:11.55; Video 41 at 2:12.56. Kenneth McClinton, who was carrying a baseball bat, and two of his associates -- presumably Tiffany McClinton and Anthony McClinton, see Tr. 391 -- walked up to the front of 2270 Walton Avenue and spoke with someone on the second floor of the building, presumably Mileni Fernandez, see Tr. 393. Video 40 at 2:38.20. The group left shortly after speaking to Mileni Fernandez. Video 40 at 2:39.44.

The outbreak of the initial melee is the next scene visible on the surveillance video. Video 40 at 2:40.38. Kenneth McClinton struck Mileni Fernandez in the head with a baseball bat. Video 40 at 2:40.44. Virgilio Ruiz wielded a hammer. Video 40 at 2:41.38. The petitioner and Alex Santana attacked a member of the McClinton group. Video 40 at 2:41.21. Eventually the initial melee broke up, and part of the McClinton group attempted to follow the Santana group into the entrance of the apartment building. Video 40 at 2:41.58.

Video surveillance in the entrance of the apartment building showed Alex Santana and Mileni Fernandez run out of what appears to be a stairwell door and chase after the McClinton group shortly after they had entered the apartment building. Video 41 at 2:43.32; Video 40 at 2:43.40. The petitioner followed them with a knife in his right hand. Video 40 at 2:43.40. Virgilio Ruiz and a man in a grey sweatshirt carrying a knife in his right hand -- later identified as Ray Sanchez -- can be seen following the petitioner shortly after. Video 40 at 2:43.45.

A surveillance camera on the corner of Walton Avenue and 183rd Street shows Alex Santana chasing after a group of people with a knife in each hand. Video 31 at 3:15.42. The petitioner can be seen following him shortly afterward, carrying one knife. Video 31 at 3:15.46. Mileni Fernandez and Virgilio Ruiz followed

both of them. Video 31 at 3:15.49-3:15.56. Virgilio Ruiz was carrying a hammer. Video 31 at 3:15.55. Ray Sanchez followed closely behind the Santana family. Video 31 at 3:16.00.

The remaining video surveillance apparently captures what occurred following the stabbing. Surveillance footage from outside the Santanas' apartment building shows the group returning after having run around the corner of 183rd Street, where the stabbing apparently occurred. Video 40 at 2:44.22-2:44.58. Video from an elevator in the apartment building shows the Santana group returning to their apartment shortly thereafter. Video 41 at 2:45.12. Alex Santana and the petitioner entered the elevator with their mother. Video 41 at 2:45.17. The petitioner was wearing a long-sleeved beige shirt under a darker colored vest, and Alex was wearing a green t-shirt. Video 41 at 2:45.17. The petitioner had blood on his hands, and Mileni Fernandez was bleeding from her head. Video 41 at 2:45.17. Alex also had a bloodstain on his hand. Video 41 at 2:45.56. The petitioner can be seen briefly holding a knife and then dropping it on the floor. Video 41 at 2:45.19-2:45.20. The petitioner held his mother's head in his hands during most of the elevator ride. Video 41 at 2:45.17-2:45.56. As the group exited the elevator, Alex bent down briefly over the narrow space between the floor and the elevator. Video 41 at 2:45.59-2:46.00.

Police began to arrive on the scene shortly after the Santanas reentered their apartment building. Video 40 at 2:46.49. The stabbing itself does not appear in any of the surveillance footage. Tr. 445.[2]

Officer Alejandro Ponce was on plainclothes duty in the 46th Precinct the night of New Year's Eve 2007 and into New Year's Day 2008. Tr. 191-92. Officer Ponce was with Sergeant Patrick Hennessy and Officer Joe White. Tr. 71, 192. The officers, who were on patrol, eventually responded to a "radio run[]" of shots fired near 183rd Street and Walton Avenue. Tr.

---

[2] The petitioner asserts for the first time in his reply brief that Kenneth McClinton was stabbed "by Alexander in full view of the building's security camera" before the petitioner arrived. Pet'r's Reply Br. 2, 5-6; ECF No. 43. That assertion is completely unsubstantiated by the video evidence. The petitioner's reply brief was unaccompanied by any specific citation to the surveillance video. Upon inquiry from the Court, the petitioner later argued that Video 40 shows Alex Santana stabbing Kenneth McClinton while the petitioner was still inside the apartment building. ECF No. 43; Video 40 at 2:43.30-2:43.36. The petitioner did not raise this interpretation of the video during any of the state court proceedings. In his opening brief in this Court, the petitioner cited the exact same portions of the video evidence but never alleged that they depicted the stabbing. See Pet'r's Supp. Am. Pet. 3. The video evidence plainly does not support this newly-advanced theory. Alex Santana can be seen exiting the apartment building and chasing after a group containing Kenneth McClinton, but no stabbing occurs during that portion of the video. Video 40 at 2:43.30-2:43.36. If, as the petitioner now speculates, Kenneth McClinton was stabbed in the melee outside the petitioner's apartment building, he would have expired there from his wounds, according to the medical evidence, Tr. 534-37, and not around the corner where he was found, Tr. 290, 384. Rather, Alex Santana continues to chase after the group containing Kenneth McClinton, and is followed closely behind by Mileni Fernandez and then by the petitioner. Video 40 at 2:43.36-2:43.43. The entire group then disappears from the surveillance camera's view, and the Santana group later returns to view and reenters the apartment building. See Video 40 at 2:43.55-2:44.57.

194. When they arrived, the officers saw a large group of people standing around the corner as if "there had just been an altercation or some sort of fight." Tr. 194. Officer Ponce recognized Kenneth McClinton lying in the street, conscious but unable to speak. Tr. 195. Mr. McClinton was taken to Saint Barnabas Hospital, where he was pronounced dead. Tr. 50-51.

Shortly after the officers arrived on the scene, Tiffany McClinton and another young woman approached Officer Ponce in order to identify Ray Sanchez as one of the perpetrators of Kenneth McClinton's homicide. Tr. 196-97, 295-97. Officer Ponce apprehended Ray Sanchez. Tr. 198. The two women, joined by a third, also pointed to where Alex and the petitioner were standing near an ambulance tending to their mother's head wounds. Tr. 199-200. Officer Ponce then apprehended Alex Santana and the petitioner. Tr. 203. Officer Ponce vouchered for evidence a baseball bat and a number of knives that were found at the crime scene. Tr. 201, 207, 432.

Detective Gerald Heanue was the detective on duty assigned to handle the McClinton homicide. Tr. 426, 428. At the time he was taken into custody, the petitioner was wearing a long-sleeved white or beige hooded sweatshirt with blue jeans and white sneakers. Tr. 434-35. Detective Heanue did not observe any blood on the petitioner's clothing. Tr. 434-35. Detective Heanue

vouchered both the petitioner's and Alex Santana's clothing for evidence. Tr. 435, 439.

Detective Heanue spoke with Tiffany McClinton later that night. Tr. 462. At that time, Tiffany McClinton did not tell Detective Heanue that the petitioner had stabbed Kenneth McClinton, and did not mention witnessing the stabbing in a written statement she provided to police. Tr. 463, 465.

During the course of Detective Heanue's cross-examination at trial, Alex Santana's counsel, Robert Laureano, elicited testimony regarding Ray Sanchez's arrest, booking, and eventual release. Tr. 472-75. Mr. Laureano apparently hoped to suggest to the jury that the police released a person who should have been considered a suspect. Tr. 473-74. The prosecution objected to certain of the questions on relevance grounds. Tr. 472-73. At a sidebar, the court instructed that Mr. Laureano was free to elicit that Ray Sanchez had been arrested and released, but that if Mr. Laureano inquired into why Sanchez was released, the door would then be opened to testimony regarding Sanchez's identification of the petitioner and Alex Santana as the perpetrators. Tr. 473-74. The petitioner's counsel, Fred Bittlingmaier, did not object to Mr. Laureano's cross-examination, and did not say anything during the sidebar. Tr. 472-75. Detective Heanue went on to testify that Ray Sanchez was released from custody at the direction of the Bronx District

Attorney's Office. Tr. 475. Mr. Laureano then questioned Detective Heanue about Fernando Valentine, who had also been arrested and subsequently released, and a statement Mr. Valentine made to the police while in custody about the fact that Ray Sanchez had a knife. Tr. 480-81. No party objected to this line of questioning. Tr. 480-81.

On redirect, the prosecutor elicited from Detective Heanue that "there was no evidence that Ray Sanchez had ever stabbed anyone in connection with" the McClinton homicide. Tr. 489. He also questioned Detective Heanue about the witness statement Mr. Valentine made while in police custody, including eliciting that Mr. Valentine had stated that Ray Sanchez, Alex Santana, and the petitioner had all carried knives to the scene of the crime. Tr. 490-91. Mr. Bittlingmaier and Mr. Laureano both objected to the prosecutor's question regarding whether Mr. Valentine had told Detective Heanue that anyone other than Ray Sanchez had had a knife, and the trial judge overruled those objections. Tr. 490.

The prosecutor next attempted to ask Detective Heanue whether Fernando Valentine gave Detective Heanue "any information about in fact who did stab" Kenneth McClinton. Tr. 491. Mr. Bittlingmaier and Mr. Laureano both immediately objected on hearsay grounds. Tr. 491. At a lengthy sidebar, the prosecutor argued that the question was proper because Mr. Laureano opened the door to Detective Heanue's explanation of

the police investigation by asking him whether Fernando Valentine stated that Ray Sanchez had a knife. Tr. 492-93. In response, Mr. Bittlingmaier noted that his own client was now "in an untenable position" because Mr. Laureano opened the door to testimony unfavorable to the petitioner. Tr. 493-94. The court noted that Mr. Bittlingmaier was present and said nothing at the sidebar when the court and the prosecutor pointed out that Mr. Laureano's cross-examination would "open the door" to testimony about why Ray Sanchez was released from custody. Tr. 496. Nonetheless, the court directed the prosecutor to restrict his question to whether Fernando Valentine had indicated that Ray Sanchez did not stab anyone. Tr. 496-97. Detective Heanue testified that it was clear to him after speaking with Fernando Valentine that Ray Sanchez did not stab Kenneth McClinton. Tr. 497.

Dr. Monica Smiddy, a medical examiner in New York City's Office of the Chief Medical Examiner ("OCME"), performed an autopsy on Kenneth McClinton and testified regarding the cause of death. Tr. 512, 516. She testified that Kenneth McClinton received three stab wounds to his chest. Tr. 520. One stab wound near Mr. McClinton's clavicle perforated the upper lobe of his right lung. Tr. 524. A second stab wound perforated the lower lobe of the right lung and the liver. Tr. 531. The third stab wound perforated the lower lobe of the left lung, the

pericardial sac, the lower border of the heart, and the abdominal aorta. Tr. 533. These three stab wounds resulted in Kenneth McClinton losing approximately half of his blood volume. Tr. 534. Dr. Smiddy testified that any one of the two stab wounds to the lungs would have been fatal within seconds to minutes if not treated very quickly, and the stab wound to the heart would have been fatal in seconds. Tr. 536-37. Dr. Smiddy also testified that the wounds to the lungs would have made it close to impossible to breathe. Tr. 536. Dr. Smiddy testified that it was "unlikely" that the same knife produced all three stab wounds. Tr. 542-43.

Katey Nori, a forensic scientist and senior supervisor with the OCME, testified regarding the DNA evidence gathered by police. Tr. 572-73.

The OCME received and tested clothing from Alex Santana and the petitioner along with a baseball bat and eight knives recovered from in and around the crime scene. Tr. 579. The petitioner's clothing did not contain any DNA from Kenneth McClinton. Tr. 583. Two bloodstains on Alex's t-shirt and a bloodstain on his shoes tested positive for Kenneth McClinton's DNA, and Kenneth's DNA was contained in a mixture of DNA found on Alex's jeans. Tr. 583-84.

The baseball bat contained a bloodstain that matched Mileni Fernandez's DNA. Tr. 582-83. Kenneth McClinton's DNA was found

on a bloodstain on a knife with a bent blade. Tr. 589-90. The handle of that same knife contained "touch DNA" -- DNA deposited on objects from skin cells -- in minor amounts from Alex and in major amounts from the petitioner. Tr. 590, 593. The OCME identified the petitioner as a contributor of touch DNA to a second knife handle, and he could not be excluded as a provider of touch DNA to two other knife handles. Tr. 599-600. Ms. Nori acknowledged that there is no way to tell when touch DNA, or any kind of DNA, is left on an object. Tr. 598.

The OCME also tested a bloodstain on the shirt Alex Santana was wearing the night of the murder, and that stain tested positive for Kenneth McClinton's DNA. Tr. 585-88. One of the bloodstains was deposited on the shirt in a "transfer-like pattern," which Ms. Nori testified was evidence that the blood was "rubb[ed] or transfer[ed] from [one] item to another item." Tr. 620-21. The prosecution argued to the jury that the petitioner wiped the blade of the knife on Alex Santana's t-shirt in the elevator after the stabbing. Tr. 847-48. Kenneth McClinton's DNA was not found on any clothing collected from the petitioner. Tr. 583.[3]

Ms. Nori did not personally conduct any examination of the t-shirt that Alex Santana had been wearing or the knife with the

---

[3] The OCME did not receive for testing the dark colored vest the petitioner was wearing over his beige long-sleeved shirt. Tr. 605-06.

bent blade that contained DNA from both Kenneth McClinton and
the petitioner. Tr. 638, 643, 645. The record is silent as to
whether she conducted testing of any of the other physical
evidence submitted to OCME. Ms. Nori testified that OCME works
on a rotation basis whereby analysts are assigned to different
tasks on different weeks. Tr. 644. All analysts who do DNA
testing have the same training and credentials as Ms. Nori, and
supervisors are always present while analysts conduct these
tests. Tr. 644-45.

The petitioner was tried on charges of murder in the second
degree and manslaughter in the first degree. He was acquitted of
the murder charge and convicted of first-degree manslaughter,
and was sentenced as a second-felony offender to twenty years'
imprisonment followed by five years' post-release supervision.
Tr. 890; see Tr. 24.

**B.**

The petitioner appealed to the Appellate Division, First
Department. The petitioner argued, among other things, that the
trial court improperly allowed the prosecutor to elicit
prejudicial hearsay regarding what Fernando Valentine
communicated to Detective Heanue in violation of the
Confrontation Clause.

The Appellate Division unanimously affirmed the
petitioner's conviction. People v. Santana, 978 N.Y.S.2d 225,

225 (App. Div. 2014). The court found that the petitioner's argument regarding the elicited hearsay testimony was unpreserved because the petitioner's counsel eventually acquiesced to the hearsay testimony. Id. at 226. The court further noted that the petitioner's claim was unpreserved because counsel's objections were grounded in state evidentiary law and "thus failed to preserve a Confrontation Clause claim." Id.

The court also rejected the petitioner's Confrontation Clause challenge on the merits because "[t]he detective's testimony was admissible for the legitimate nonhearsay purposes of explaining the police investigation in the context of issues raised at trial." Id. The court reasoned further that "the codefendant unequivocally opened the door to such testimony." Id. Finally, the court concluded that in any event, "any error in receiving the challenged testimony was harmless in light of the overwhelming evidence of defendant's guilt." Id.

Leave to appeal to the Court of Appeals was denied. People v. Santana, 17 N.E.3d 511, 511 (N.Y. 2014).

## C.

The petitioner later moved pro se for an order to vacate the judgment pursuant to New York Criminal Procedure Law §§ 440.10(1)(b), (1)(f), and (1)(h), arguing that he had received ineffective assistance of trial counsel and that he was

16

actually innocent. Dkt. 22-2 at 1. In particular, the petitioner

argued that he was deprived of effective assistance of counsel

because trial counsel 1) failed to move to sever his trial from

his brother's, id. at 10; 2) failed to investigate Fernando

Valentine, the witness whose statements were the subject of

Detective Heanue's hearsay testimony, id. at 15; 3) failed to

object to Detective Heanue's testimony and to the prosecution's

allegedly improper remarks during summation, id. at 16, 18; and

4) failed to call the petitioner's mother, stepfather, and

younger brother as witnesses at trial, id. at 18.

The court rejected the petitioner's claim that trial

counsel was ineffective for failing to move for a severance

because it was not clear that such a motion would have been

successful, and in any event, the petitioner had failed to show

that trial counsel lacked a legitimate strategic explanation for

the decision not to file such a motion. Id. at 10-15. Indeed,

trial counsel affirmed that he had determined after a lengthy

discussion with Alex's counsel, Mileni Fernandez, and Virgilio

Ruiz, "that the combined trial would be an appropriate forum in

which to resolve" the two cases. Id. at 15. The court also found

that because the defendants acted in concert, the same evidence

would have been admissible against the petitioner at a separate

trial, and that the petitioner had failed to establish with any

certainty that the petitioner's brother would in fact have

waived his Fifth Amendment rights and testified on the petitioner's behalf at a separate trial. Id. at 10-12.

The court also rejected the petitioner's claim that trial counsel was ineffective for failing to investigate whether Fernando Valentine might have been able or unable to recognize the petitioner as a perpetrator of the crime. Id. at 15. The court concluded that, in light of the fact that Mr. Valentine was apparently related to the petitioner, and was at the same party as the petitioner the night of the stabbing, any suggestion that Mr. Valentine would have been unable to identify the defendant was "unworthy of belief." Id. at 15-16. Accordingly, the court found that the petitioner had failed to show how further investigation of Mr. Valentine could have been "possibly exculpatory." Id. at 15 (alterations omitted).

The court also rejected the petitioner's argument that counsel was ineffective for failing to object to Detective Heanue's hearsay testimony regarding Mr. Valentine's statements to the police and to the prosecutor's allegedly improper remarks during summation. Id. at 16, 18. The court determined that, in light of the fact that the Appellate Division had already determined that the contested testimony had been properly admitted and that any error was harmless, any failure to object to such testimony could not have constituted ineffective assistance. Id. at 17; see Santana, 978 N.Y.S.2d at 226. For

precisely the same reason, counsel could not have been ineffective for failing to object during summation, because the Appellate Division had already determined that the summation had not deprived the petitioner of due process. Dkt. 22-2 at 18; see Santana, 978 N.Y.S.2d at 226.

The court then rejected the petitioner's claim that trial counsel was ineffective for failing to call three of his family members as witnesses because the petitioner could not show an absence of strategic or otherwise legitimate explanations for counsel's failure to call these witnesses. Dkt. 22-2 at 18-25. In particular, the court found that the petitioner's counsel had explicitly considered calling the petitioner's mother and stepfather as witnesses but eventually concluded that they would not be called "given their inability to meaningfully add to the defense." Dkt. 22-2 at 21-22.

Finally, the court rejected any claim of actual innocence, agreeing with the Appellate Department's assessment that "the evidence of defendant's guilt was overwhelming." Id. at 26. The court also concluded that the petitioner's newly proffered affidavits of his mother, stepfather, and younger brother were insufficient to warrant a hearing on the actual innocence claim in light of the testimonial, surveillance, and forensic evidence presented at trial. Id. at 26.

Leave to appeal to the Appellate Division was denied. S.R. 609.

## D.

The petitioner next moved for a writ of error coram nobis in the Appellate Division, alleging that his appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to object to the testimony of the forensic expert on Confrontation Clause grounds. The Appellate Division summarily denied the motion, and leave to appeal to the Court of Appeals was denied. S.R. 929, 936.

## II.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). See also Washington v. Griffin, 876 F.3d 395, 403 (2d Cir. 2017); Bradley v. Burge, No. 06-cv-0040, 2007 WL 1225550, at *4 (S.D.N.Y. Apr. 19, 2007).

A state court decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000); see Washington, 876 F.3d at 403.

A state court decision involves an unreasonable application of clearly established Federal law when "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." Washington, 876 F.3d at 403 (quoting Bell v. Cone, 535 U.S. 685, 694 (2002)). To meet that standard, the state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). "[I]t is well established in [this] circuit that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003) (internal quotation marks omitted). See also Muir v. New

York, No. 07-cv-7573 (JGK), 2010 WL 2144250, at *3-4 (S.D.N.Y.
May 26, 2010).[4]

The petitioner claims ineffective assistance of both trial
and appellate counsel. To establish ineffective assistance of
counsel a petitioner must show that "(1) counsel's performance
was deficient and (2) the deficient performance prejudiced the
defense." Bunkley v. Meachum, 68 F.3d 1518, 1521 (2d Cir. 1995)
(citing Strickland, 466 U.S. at 687). The first prong of the
Strickland test "requires showing that counsel made errors so
serious that counsel was not functioning as the 'counsel'
guaranteed the defendant by the Sixth Amendment." Strickland,
466 U.S. at 687. To satisfy the second prong of the test, the
petitioner must show that "there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different." Id. at 694. See also
Gueits v. Kirkpatrick, 612 F.3d 118, 122-23 (2d Cir. 2010);
Martin v. Ercole, No.     09-cv-7234, 2012 WL 4341628, at *4
(S.D.N.Y. Sept. 22, 2012).

---

[4] The petitioner's CPL § 440.10 motion was based entirely on
ineffective assistance of trial counsel claims. Although the trial
court analyzed these claims under New York constitutional law
standards, the Second Circuit Court of Appeals has held that the New
York standard for ineffective assistance of counsel is not contrary to
the federal constitutional standard set forth in Strickland v.
Washington, 466 U.S. 668 (9184). See Rosario v. Ercole, 601 F.3d 118,
126 (2d Cir. 2010). Therefore, this court must determine whether the
state court decision was an unreasonable application of the Strickland
standard.

A habeas petitioner asserting ineffective assistance of counsel must show both that counsel's performance was unreasonable and that the state court's decision to the contrary was unreasonable. Therefore, a "doubly deferential" standard of judicial review applies to ineffective assistance of counsel claims analyzed under 28 U.S.C. § 2254(d)(1). Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

### III.

### A.

### 1.

The petitioner first claims trial counsel was ineffective for allowing the petitioner's family to dictate trial strategy to his brother's benefit and to his detriment. Pet'r's Supp. Am. Pet. at 10-11. The respondents argue the claim is unexhausted and should be denied on the merits in any event. Mem. in Opp'n at 22-26.

A federal court may not grant a writ of habeas corpus unless the petitioner "has exhausted the remedies available" in state court. 28 U.S.C. § 2254(b)(1)(A). See also Ramirez v. Att'y Gen., 280 F.3d 87, 94 (2d Cir. 2001); Melendez v. LaValley, 942 F. Supp. 2d 419, 422 (S.D.N.Y. 2013). This means that petitioner must "'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to

the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27,
29 (2004). To present his claim fairly, the petitioner must
argue "the essential factual and legal premises of his federal
constitutional claim to the highest state court capable of
reviewing it." Cotto, 331 F.3d at 237. "[I]f material factual
allegations were omitted, the state court has not had a fair
opportunity to rule on the claim." Daye v. Att'y Gen., 696 F.2d
186, 191 (2d Cir. 1982) (en banc). However, "dismissal is not
required when evidence presented for the first time in a habeas
proceeding supplements, but does not fundamentally alter, the
claim presented to the state courts." Caballero v. Keane, 42
F.3d 738, 741 (2d Cir. 1994).

The respondents argue that the petitioner's claim that
trial counsel was ineffective for allowing the petitioner's
family to dictate trial strategy was an "essential factual"
premise not presented to the state courts. The petitioner argues
that this point is simply a version -- "somewhat refined by the
intervention of counsel" -- of arguments that the petitioner
presented in his CPL § 440.10 motion.  Pet'r's Reply Br. at 3.

The petitioner filed his CPL § 440.10 motion pro se. He
argued extensively that trial counsel was ineffective for
failing to call his mother, stepfather, and younger brother to
testify. S.R. 225-26. In support, the petitioner attached three
affidavits, one from each family member, detailing what their

testimony would have been had trial counsel let them testify. S.R. 254-59. The petitioner also argued in that motion that trial counsel was ineffective for failing to move to sever his trial from his brother's. S.R. 227-30.

The argument the petitioner presents to this Court is simply an organizational refinement of the two arguments he presented in his CPL § 440.10 motion. Indeed, the prejudice he now argues he suffered as a result of his family's involvement in trial strategy mirrors the arguments he made in the state courts: his family members were not called to testify, and his trial counsel did not move for a severance. This argument "supplements" rather than "fundamentally alters" the arguments presented by the petitioner in the state court proceedings. Caballero, 42 F.3d at 741. Therefore, this claim is exhausted.

**2.**

Nevertheless, the claim is meritless. In support of this claim, the petitioner relies on a single paragraph in an affidavit submitted by trial counsel in support of the prosecutor's opposition to the CPL § 440.10 motion. Trial counsel affirms that he decided not to move to sever the case after consultation with Alex's defense counsel and Mileni Fernandez and Virgilio Ruiz. According to the petitioner, this

statement is proof that Alex's counsel and the family determined the defense strategy without any input from the petitioner.[5]

The paragraph does not support that argument. Mr. Bittlingmaier describes a single instance in which he recalled discussing the joint trial with the petitioner's family and Alex's counsel. The paragraph, and the affidavit as a whole, does not state or suggest that counsel failed to consult with the petitioner regarding the defense strategy or that his strategy was controlled by other family members. Mr. Bittlingmaier's affidavit understandably did not respond to an allegation that the Santana family dictated his defense strategy because that was not the thrust of the ineffectiveness charge made against him. He did, however, affirm that he "rejected defendant's assertions that undergird his attack on my representation of him. Indeed, . . . I did everything that I could to represent him zealously, and to ensure that he received a fair trial." S.R. 449.

---

[5] In the petitioner's reply brief, he argues that "[t]rial counsel never met personally with Petitioner prior to the start of the trial. He never advised him of the advantages to Petitioner of a separate trial." Pet'r's Reply Br. 3. To the extent the petitioner is attempting to argue that trial counsel was ineffective for failing to meet or discuss trial strategy with him, that argument was raised for the first time in reply and is deemed forfeited. In any event, that assertion is not supported with any citation to the record or any affidavit from the petitioner or his trial counsel and is inconsistent with the fact that the petitioner's counsel had represented the petitioner since January 7, 2008, two and a half years prior to trial, and represented the petitioner at the pre-trial suppression hearing. S.R. 448; see Tr. 2. Therefore, even if the argument were not forfeited, it is meritless.

Moreover, the petitioner has not shown that his counsel's strategy constituted deficient performance. Trial counsel casted doubt on the prosecution's forensic, video, and eyewitness evidence, and ably argued that the only witness who identified the petitioner as a participant in the killing was unworthy of belief. Indeed, Mr. Bittlingmaier effectively elicited from Tiffany McClinton that her initial statements to the police contained no reference to the petitioner's stabbing Kenneth McClinton. Counsel's representation resulted in the petitioner's acquittal of second-degree murder. See Petrucelli v. United States, No. 05-cv-9582, 2009 WL 4858081, at *6-8 (S.D.N.Y. Dec. 15, 2009) (rejecting the petitioner's argument that he was denied effective assistance of counsel when counsel's alleged allegiance to other clients "dictated . . . trial strategy at the expense of" the petitioner).

There is also no evidence that the petitioner ever indicated any disagreement with trial counsel's strategy. Even had the petitioner urged counsel to argue that Alex, not the petitioner, stabbed Kenneth McClinton, counsel might reasonably have concluded that such an argument would have been unworthy of belief given Donisha Riggins' testimony, Tiffany McClinton's vivid description of the stabbing, and forensic and video evidence that corroborated their account of the evening's events.

Because the petitioner has failed to show that counsel's performance was deficient or that any deficiency prejudiced the defense, the petitioner's claim that counsel was ineffective for allowing his family to dictate trial strategy to protect Alex is meritless and the state court's conclusion that the petitioner's trial counsel provided effective assistance of counsel was not an unreasonable application of Strickland.

**B.**

The petitioner next argues that trial counsel was ineffective for failing to call his mother, stepfather, and younger brother as witnesses on his behalf.

"Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (quoting Strickland, 466 U.S. at 689). "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) (internal quotation marks omitted). A defense lawyer's decision whether "to call specific witnesses -- even ones that might offer exculpatory evidence -- is ordinarily not viewed as a lapse in professional representation." United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997).

In this case, the petitioner's counsel clearly weighed whether to call the petitioner's mother and stepfather. Before the defense case, Mr. Laureano told the court the first witness would be Virgilio Ruiz, the petitioner's stepfather. But later that day, Mr. Laureano explained his decision not to call Virgilio Ruiz.

> MR. LAUREANO: . . . [Over] Memorial Day weekend, [Mr. Bittlingmaier] and I met with [Mr. Ruiz] in my office to prepare him for today. And also he was in my office over the lunch hour, and we decided, co-counsel and myself, not to call him. I just wanted my client to be aware that efforts were made to reach out to those witnesses and interview them, and I have spoken to my client and have just let him know I would not be calling him.

Tr. 671-72. After Mr. Laureano stepped out of the courtroom to locate the next witness, Mr. Bittlingmaier added other reasons for not calling Virgilio Ruiz.

> MR. BITTLINGMAIER: Judge, with your permission, I'd just like to put one thing on the record as to what Mr. Laureano said – I don't want the record to intimate in any way that the gentleman's story changed in any way, shape, or form from Monday until today, just that further conversation with him, in my opinion, his testimony would have been cumulative, would have involved issues that have already been dealt with, for the most part, and it would actually be Mr. Laureano's witness in any event, but I certainly spoke to him today, and based upon

> my conversation with him, I decided I would
> not be calling him on behalf of my client
> either.

Tr. 672-73 (emphases added).

Mr. Laureano also explained his decision not to call Mileni
Fernandez.

> MR. LAUREANO: . . . I have spoken to [Ms.
> Fernandez] on several occasions in regard to
> what her testimony would be. It is my
> position, Judge, that her testimony, um,
> would — I am not saying "could," would
> incriminate [Alex Santana], based upon my
> conversations with her. That is the reason,
> and the only reason, why I did not decide to
> call their mother.

Tr. 785-86 (emphasis added).

Virgilio Ruiz and Mileni Fernandez were not passive
bystanders to the stabbing. They both took part in the melee,
and the video surveillance cameras captured both of them
accompanying the petitioner and Alex towards the area where
Kenneth McClinton was later found after having been stabbed.
Dkt. 22-1 at 22. Given their own self-interest, as well as their
interest in casting their children in the most favorable light,
trial counsel could have reasonably determined that the jury
would not credit their testimony.

The petitioner has likewise failed to point to the absence
of strategic reasons not to call his younger brother, Giovanni
Ruiz. Giovanni affirmed in an affidavit that he "would have

testified that [his] brother Charles did not stab the deceased."
S.R. 259. Even assuming Giovanni Ruiz would have testified that
the petitioner had not stabbed Kenneth McClinton, trial counsel
could reasonably have chosen not to call Giovanni given his age
(he was ten at the time of trial) and his obvious interest in
protecting his family. The trial court reasonably found that
"counsel could have concluded that the child would not do well
when cross-examined by an experienced homicide prosecutor." Dkt.
22-2 at 24. The trial court therefore concluded that the failure
to call the three witnesses did not constitute ineffective
assistance of counsel. Id.

Because the petitioner has failed to point to the absence
of strategic reasons for failing to call these three witnesses,
he has not demonstrated that trial counsel's performance was
deficient and cannot establish ineffective assistance of
counsel. The decision of the state court rejecting this argument
was therefore not an unreasonable application of federal law.
See Ryan v. Rivera, 21 F. App'x 33, 35 (2d Cir. 2001) (summary
order) (rejecting the petitioner's ineffective assistance of
counsel claim based on counsel's failure to call witnesses when
counsel concluded that the witnesses "were not credible or that
their testimony would harm [the petitioner] more than it would
help him").

## C.

The petitioner next argues that trial counsel was ineffective for failing to move for a severance. According to the petitioner, the joint trial resulted in Alex's trial counsel "effectively becoming a second prosecutor." Pet'r's Supp. Am. Pet. at 12. The petitioner points to four instances where Mr. Laureano's defense of Alex allegedly prejudiced the petitioner's defense.[6]

Under New York law, a trial judge may try separately jointly charged co-defendants for good cause shown, including upon "a finding that a defendant . . . will be unduly prejudiced by a joint trial." N.Y. Crim. Pro. § 200.40(1).

Severance is required when 1) the "core" of each defense is in irreconcilable conflict with the other; and 2) "there is a significant danger . . . that the conflict alone would lead the jury to infer defendant's guilt." People v. Mahboubian, 543 N.E.2d 34, 39 (N.Y. 1989) (emphasis added). Otherwise, an application for severance is left to the discretion of the trial judge. People v. Cardwell, 580 N.E.2d 753, 753 (N.Y. 1991).

The petitioner cannot show that his and his brother's defenses were irreconcilable with each other. Each of their

---

[6] The respondent briefly argues that this claim is unexhausted because the petitioner in his CPL § 440.10 motion pointed to different reasons that counsel's failure to move to sever the trial prejudiced his defense. The Court need not reach the issue of exhaustion because the claim is "plainly meritless." See Rhines v. Weber, 544 U.S. 269, 277 (2005).

defenses were susbtantially the same: counsel attempted to cast doubt on the eyewitness, video, and physical evidence gathered from the crime scene such that the jury would not be convinced of either defendant's involvement in the stabbing. The petitioner argues that Alex "admitted to stabbing Kenneth McClinton and was arguing self-defense," Pet'r's Reply Br. at 3, but that is clearly incorrect. The judge did not give a self-defense instruction to the jury, and neither of co-defendant's counsel requested one in the charge conference. Tr. 698 ("THE COURT: . . . So if somebody starts talking about self-defense and justification, then I am going to have to tell them it doesn't apply here. I think we're all on the same page here, is that right. MR. BITTLINGMAIER: Yes, Judge. MR. LAUREANO: Yes, Judge."). Indeed, Alex's counsel argued in summation that the eyewitnesses were not credible and that, "There is no direct evidence . . . that suggests on this video that my client committed the crime." Tr. 805.

Therefore, a severance was not required and the decision to sever would have been "directed to the sound discretion of the trial court." People v. Bornholdt, 305 N.E.2d 461, 467 (N.Y. 1973). "Where proof against the defendants is supplied by the same evidence, only the most cogent reasons warrant a severance." Id. Here, the evidence against both brothers was the same, and consisted of videotape surveillance, eyewitness

testimony, and forensic evidence. Moreover, the petitioner and Alex were charged with acting in concert, so all of the same evidence would have been admissible at a trial of the petitioner alone. See Dkt. 22-1 at 11. A severance was therefore unwarranted, and any such motion is likely to have failed. Because a motion to sever would have had little chance of success, trial counsel cannot have provided ineffective assistance for failing to make such a motion. United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995) (holding that counsel's "failure to make a meritless argument does not rise to the level of ineffective assistance"). The state court's determination that failing to move for a severance did not constitute ineffective assistance of counsel was therefore not an unreasonable application of federal law.

### D.

The petitioner also faults trial counsel for failing to object to Detective Heanue's testimony regarding Fernando Valentine's out-of-court statement to the police.

The petitioner made the same argument in his direct appeal. The Appellate Division rejected this argument as unpreserved but went on to reject it on the merits as well. Santana, 978 N.Y.S.2d at 226. The Appellate Division held that "[t]he detective's testimony was admissible for the legitimate nonhearsay purposes of explaining the police investigation in

the context of issues raised at trial, and for the related reason that the codefendant unequivocally opened the door to such testimony." Id. (citation omitted). Because the Appellate Division rejected this argument on the merits, any objection at trial was likely to have been overruled by the trial court. Trial counsel's failure to make an unmeritorious objection does not constitute defective performance. Kirsh, 54 F.3d at 1071. Therefore, the petitioner's argument was properly rejected by the state court.

The Appellate Division also concluded that any error in receiving the challenged testimony was harmless in light of the overwhelming evidence of the petitioner's guilt. This conclusion was plainly correct because ultimately, after objections by counsel for the petitioner and his brother, the statement by Valentine was limited to a statement that Sanchez did not stab Kenneth McClinton, and there was no statement that the petitioner or his brother stabbed Kenneth McClinton. Given all the other evidence in the case, the state court was plainly correct that any such statement was harmless beyond a reasonable doubt.

### E.

Finally, the petitioner claims his appellate counsel on direct appeal was ineffective for failing to argue that trial counsel was ineffective for failing to preserve a Confrontation

Clause challenge to Katey Nori's expert forensic testimony. This argument is without merit.

The Strickland standard applies to claims of ineffective assistance of appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000). "[A]ppellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Chrysler v. Guiney, 806 F.3d 104, 123 (2d Cir. 2015) (quoting Robbins, 528 U.S. at 288) (internal quotation marks omitted). Therefore, to satisfy the first prong of Strickland, the petitioner must show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). To satisfy the second prong of Strickland, the petitioner must show that "absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." Id. at 534.

The Appellate Division summarily denied the petitioner's motion for a writ of error coram nobis which raised a similar ineffective assistance claim with regard to appellate counsel on direct appeal. The deferential AEDPA standard applies to this summary disposition. See Harrington, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there

was no reasonable basis for the state court to deny relief.").
Because the Appellate Division provided no reason for its
disposition, this Court is required to examine "what arguments
or theories . . . could have supported[] the state court's
decision; and then it must ask whether it is possible fairminded
jurists could disagree that those arguments or theories are
inconsistent with the holding in a prior decision of" the
Supreme Court. See id. at 102.

The petitioner argues that appellate counsel on direct
appeal was ineffective for failing to argue that trial counsel
was ineffective for failing to raise a Confrontation Clause
objection to Ms. Nori's forensic testimony. This claim fails
because there was no basis for challenging the manner in which
trial counsel handled any Confrontation Clause issues raised by
Ms. Nori's testimony.

Ineffective assistance claims evaluate counsel's conduct
"from counsel's perspective at the time" counsel made the
challenged decision. Strickland, 466 U.S. at 689. A court
evaluating an ineffective assistance claim therefore must assess
counsel's conduct based on the controlling law at the time of
the conduct. Jameson v. Coughlin, 22 F.3d 427, 429 (2d Cir.
1994). When Ms. Nori testified at petitioner's trial in 2010,
there was no colorable Confrontation Clause objection for trial
counsel to preserve. Controlling New York law at the time

provided that a report of raw DNA testing results that does not offer any conclusion as to whether the DNA "matches" a given individual did not trigger a criminal defendant's rights under the Confrontation Clause. People v. Rawlins, 884 N.E.2d 1019, 1034-35 (N.Y. 2008). That is precisely the type of evidence that Ms. Nori relied on in this case. Thus, any objection trial counsel might have made to Ms. Nori's testimony at the time of trial likely would have been overruled.

In the period between the conclusion of the petitioner's trial in 2010 and the Appellate Division's affirmance of the petitioner's conviction in 2014, the Supreme Court modified Confrontation Clause doctrine as it applies to forensic evidence. See Washington, 876 F.3d at 404-07. As noted above, the Sixth Amendment did not require the petitioner's trial counsel to anticipate any of these changes in the law when Ms. Nori testified. See Jameson, 22 F.3d at 429. But even assuming the Supreme Court decisions that post-dated the petitioner's trial would have been relevant had the petitioner's appellate counsel raised an ineffective assistance of trial counsel claim, the petitioner has failed to demonstrate that the Appellate Division's denial of his coram nobis petition violated clearly established law that is embodied in a Supreme Court holding. See Washington, 876 F.3d at 403.

The closest Supreme Court decision on point is Williams v. Illinois, 567 U.S. 50 (2012). There, a state DNA expert testified that DNA found on a rape victim's vaginal swab matched the defendant's DNA. Id. at 61-62 (plurality opinion). The defendant challenged the state expert's testimony as a violation of the Confrontation Clause because the DNA profile from the victim's vaginal swab was developed by an outside lab and the testifying expert did not participate in or observe the outside lab's work. Id. at 59-61. The Supreme Court rejected the defendant's Confrontation Clause challenge in a plurality opinion authored by Justice Alito, joined by the Chief Justice, Justice Kennedy, and Justice Breyer, who authored his own concurrence, and Justice Thomas filed an opinion concurring in the judgment. Id. at 55, 84-86; Id. at 102-03 (Thomas, J., concurring in the judgment).

Williams is of no help to the petitioner here. The Second Circuit Court of Appeals has explained that Williams did not establish clearly any Confrontation Clause rule governing the admission of lab reports through testimony by a forensic expert who did not create the reports. See Washington, 879 F.3d at 406-07; see also United States v. James, 712 F.3d 79, 91 (2d Cir. 2013) ("The [Williams] Court came to no clear consensus as to what constituted a testimonial statement in this context . . . ."). The petitioner therefore cannot rely on

Williams to argue that he is entitled to a writ of habeas corpus under the AEDPA standard. See Harrington, 562 U.S. at 101.

Two additional Supreme Court cases regarding the Confrontation Clause and forensic evidence, Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), and Bullcoming v. New Mexico, 564 U.S. 647 (2011), similarly do not support the petitioner's claim. Those cases hold that it is a violation the Confrontation Clause to admit forensic evidence through specific types of certificates of analysis signed by lab analysts who did not testify at trial. Bullcoming, 564 U.S. at 664-65; Melendez-Diaz, 557 U.S. at 308, 310-11; see also Washington, 876 F.3d at 407. The case here is distinguishable because the prosecution called Ms. Nori to testify about the admitted forensic evidence.

Accordingly, as the Second Circuit Court of Appeals recently concluded, the uncertainty left by Williams, Bullcoming, and Melendez-Diaz, reveals that there is no clearly established law from the Supreme Court holding that Ms. Nori's forensic expert testimony violates the Confrontation Clause. See Washington, 876 F.3d at 407 ("[T]he Supreme Court has never held that the Confrontation Clause requires an opportunity to cross-examine each lab analyst involved in the process of generating a DNA profile and comparing it with another, nor has it held that uncertified, unsworn notations of the sort at issue here are testimonial."). The petitioner's argument in this case is even

weaker than a direct Confrontation Clause claim like those at
issue in Washington, Williams, Bullcoming, and Melendez-Diaz.
The petitioner rests his argument here on the contention that
his appellate counsel was ineffective in not arguing that his
trial counsel was ineffective in not raising a Confrontation
Clause objection to Ms. Nori's testimony. But the decisions of
his appellate counsel are entitled to deference and the decision
of the Appellate Division denying the ineffective assistance
claim is to be overturned only if it is an unreasonable
application of clearly established law by the Supreme Court. The
petitioner has not met this "doubly deferential" standard. See
Knowles, 556 U.S. at 123. The petitioner has failed to point to
any clearly established law holding that counsel provides
ineffective assistance when counsel fails to lodge a
Confrontation Clause challenge to forensic testimony in this
context, particularly in light of the uncertainty of the
underlying law on the Confrontation Clause. The Appellate
Division's rejection of his petition for a writ of coram nobis
on this ground therefore was not unreasonable. See id.
("[B]ecause the Strickland standard is a general standard, a
state court has even more latitude to reasonably determine that
a defendant has not satisfied that standard.").

Furthermore, the Appellate Division might reasonably have
concluded that trial counsel had legitimate strategic reasons

for failing to object. In particular, the Appellate Division
could have reasonably concluded that it was a sound trial
strategy for Mr. Bittlingmaier to permit the admission of the
DNA results in order to have the opportunity to cross-examine
Ms. Nori as to the effect and significance of those results.
Indeed, counsel spent a portion of his cross-examination
eliciting from Ms. Nori the fact that none of the petitioner's
clothing contained Kenneth McClinton's DNA, which tended to cast
doubt on the State's other evidence that the petitioner stabbed
Mr. McClinton. Tr. 603-06. Thus, because an ineffective
assistance of counsel claim was unlikely to succeed as part of
the petitioner's direct appeal to the Appellate Division,
fairminded jurists faced with the petitioner's motion for a writ
of error coram nobis could have concluded that appellate counsel
could not have been ineffective for failing to present the
ineffective assistance argument on direct appeal.

For all of the foregoing reasons, the petitioner's
ineffective assistance of appellate counsel claim is denied.[7]

---

[7] Any ineffective assistance claim derived from the petitioner's new
interpretation of Video 40 as showing that Alex Santana killed Mr.
McClinton without the petitioner's assistance is denied. There are
plainly exhaustion issues that preclude issuance of a writ of habeas
corpus on this ground. This interpretation of Video 40 was raised for
the first time in the petitioner's reply brief in this Court after
habeas counsel consulted the petitioner's mother. The petitioner did
not raise this argument in any of his various state proceedings.
However, any claim based on the new interpretation of Video 40 is
denied on the merits because it is "plainly meritless." See Rhines,
544 U.S. at 277. The recordings the petitioner points to do not show

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the petition is **denied.** The Clerk is directed to enter judgment and to close this case. The Court declines to issue a certificate of appealability because the petitioner has failed to make a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c).

**SO ORDERED.**

Dated:    **New York, New York**
              **January 11, 2018**

                                        **John G. Koeltl**
                          **United States District Judge**

---

Alex Santana committing the stabbing without the petitioner, nor is there any reason to believe that the events depicted on the video render it less likely that the petitioner participated in the stabbing.

43